UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE DAVID RAMOS,

                          Plaintiff,

        v.

SIMON-RO CORP.,

                          Defendant.

Case No. 06-CV-6105 (KMK)

OPINION AND ORDER

Appearances:

Terrence J. Cortelli, Esq.
Richard R. Mogg, Esq.
Howard B. Stolzenberg, Esq.
Lever & Stolzenberg
White Plains, New York
*Counsel for Plaintiff*

Joseph A. D'Avanzo, Esq.
Terrence James Cortelli, Esq.
Charles C. De Martino, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
Stamford, Connecticut
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Jose David Ramos ("Plaintiff") brings this action based in defective design,

negligent design, and failure to warn[1] against Defendant Simon Ro ("Defendant"), a

manufacturer of cranes.[2]  Defendant has moved for summary judgment on each of Plaintiff's

_____

        [1]Plaintiff's Complaint also includes a claim for breach of warranty.  Plaintiff has since abandoned this claim.  (Pl.'s Mem. in Opp'n of the Def.'s Mot. for Summ. J. ("Pl.'s Mem.") 2 n.1.)

        [2]Simon Ro was acquired by Terex Corporation and is now known as Terex Ro. (Hargreaves Dep. 13.)  For the purposes of this motion, however, the Court will continue to refer to Defendant as Simon Ro.

claims.  (Dkt. No. 24.)  For the reasons discussed below, Defendant's Motion is denied in part

and granted in part.[3]

## I.  Background

### A.  The Facts

Plaintiff Jose David Ramos ("Plaintiff") was employed as a "groundsman" for Michael

Serio, Inc., a landscaping and tree-removal company.  (Def. Simon-Ro Corporation's Statement

Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1 Stmt.") ¶ 1.)[4]  In his capacity as groundsman,

Plaintiff would clean up the debris created from the cutting and pruning of trees, and would

place excess debris into a wood chipper.  (Id. ¶ 2.)

On August 5, 2004, Plaintiff, Michael Serio ("Serio") – the owner of the company – and

three co-workers, Servando Roldan, Jesus Roldan, and Manuel Deleg, were removing a tree from

a homeowner's yard in Bronxville, N.Y.  (Id. ¶ 3.)  To assist in the removal of the tree, Serio

utilized a hydraulic truck crane with a telescoping boom to secure large branches and portions of

tree trunk as they were cut away.  (Id. ¶ 4.)  Serio would then lower the cut wood to the flatbed

of the truck.  (Id.)

The crane used by Serio was a "Stinger" Model TC-110.  (Id. ¶ 5.)  It featured a crane

---

[3]On October 26, 2007, Parties met for a pre-motion conference.  At the conference, the Court denied Plaintiff's Motion for Leave to Amend his Complaint to include a claim for punitive damages.

[4]In his memorandum of law, Plaintiff says that Defendant's Statement of Facts is "essentially accurate."  (Pl.'s Mem. 3 n.2.)  The only portion of Defendant's Statement of Facts that Plaintiff finds objectionable concerns the position of the crane when the accident occurred. (Id.)  Accordingly, because the Plaintiff agrees with Defendant's Statement of Facts – and because Plaintiff failed to comply with the strictures of Local Civil Rule 56.1 – the Court will take the facts from Defendant's 56.1 Statement on all matters but the position of Defendant's crane at the time of the accident.

assembly mounted on the back of a Ford flatbed truck, centered just behind the cab of the truck. (*Id.* ¶¶ 6-7.)  The crane was designed by Defendant, and manufactured and sold by Defendant in 1987.  (*Id.* ¶ 5.)  It was purchased by Serio on August 28, 1987, and shipped by Defendant on September 14, 1987.  (*Id.* ¶¶ 28-29.)  The crane itself – which could be operated from one of two stations located behind the cab of the truck (*id.* ¶ 8) – was hydraulically powered and featured a telescoping boom mounted on a turntable and pedestal (*id.* ¶ 6).  The boom had four six-inch-wide openings, with two on each side.  (*Id.* ¶ 9.)  These openings are inspection ports, used to view and repair the hydraulic lines and valves inside the boom without dismantling the boom. (*Id.* ¶¶ 10, 12.)  The openings become fully open, however, only when the boom is extended to a certain length such that the openings on the sides of the boom line up with the openings on the sides of the inner boom stage.  (*Id.* ¶ 11.)

At the time of the accident in question, Serio was operating the crane, and one of Plaintiff's co-workers, Servando Roldan, was on the ground cutting a section of tree trunk.  (*Id.* ¶ 15; Pl.'s Dep. 31.)  Plaintiff was relaying information between Serio and Servando Roldan, who – because of their relative positions – could not see each other.  (Pl.'s Dep. 32; Serio Dep. 80.) After cutting in one area, Servando Roldan decided to move his position, and told Plaintiff to instruct Serio to stop operation of the crane.  (Def.'s 56.1 Stmt. ¶ 17; Pl.'s Dep. 32.)  Plaintiff did what was asked of him, and Serio stopped the crane.  (Pl.'s Dep. 32.)  When Servando Roldan moved to the new area, Plaintiff could not longer see where Servando Roldan was cutting.  (*Id.* 32.)  Thus, in order to more effectively relay communications between Serio and Servando Roldan, Plaintiff improved his sight lines by climbing onto a three-foot high log that was sitting

on the flatbed of the truck. (*Id.* 33.)[5] Standing on top of the log, Plaintiff could see both Serio and Servando Roldan. (*Id.* 32.)

As Plaintiff climbed on top of the log, he reached up for the boom of the crane to steady himself. (Def.'s 56.1 Stmt. ¶ 18; Pl.'s Dep. 32.) Plaintiff did not look up at the boom as he grabbed it, and his hand found one of the inspection port openings on the side of the boom. (Def.'s 56.1 Stmt. ¶¶ 18, 21; Pl.'s Dep. 42.) All of a sudden, the crane – which had been running but had not been moving when Plaintiff grabbed hold of the boom – moved, closing the inspection port and severing Plaintiff's fingers. (Def.'s 56.1 Stmt. ¶¶ 20; Pl.'s Dep. 32.)

Plaintiff's co-worker, Manuel Deleg, testified that Serio had frequently told "everybody" in Serio's work crew about the dangers of putting one's hand inside the inspection ports. (Def.'s 56.1 Stmt. 24; Deleg Dep. 52-53.) Deleg could not say that Plaintiff was individually warned, but repeated that Serio informed everyone of the danger, and that Plaintiff understood the danger. (Def.'s 56.1 Stmt. 24; Deleg Dep. 52-53.) Serio testified that he had warned Plaintiff about the dangers of working near the boom when the crane was in operation (Serio Dep. 27-28, 39), but that he had no specific recollection of warning Plaintiff about the inspection ports (*id.* 38-39). Nor did Serio recall Plaintiff ever being present while Serio used the inspection ports to view the internal mechanisms of the boom (*id.* 83). Plaintiff testified, however, that he knew that it was dangerous to interact with the boom when the crane was moving. (Pl.'s Dep. 59.)

---

[5]Although both Parties apparently agree that Plaintiff climbed atop a log that had been placed on the flatbed of the truck, Serio believes that Plaintiff was actually on top of the steel mesh bulkhead that separates the operator and the crane, as that is where Plaintiff was standing immediately after the accident occurred. (Serio Dep. 94-95, 105.) Plaintiff says that he climbed the metal bulkhead to get onto the log, but was on the log when the accident happened. (Pl.'s Dep. 48.) The bulkhead is approximately four feet high. (*Id.* 95.)

The Parties are not in complete agreement regarding the angle of the crane when the accident occurred. According to Defendant, the crane was positioned at a fifty degree angle at the time of the accident, which would have placed the inspection port 109.75 inches above the ground, and more than nine feet above the flatbed of the truck. (Def.'s 56.1 Stmt. ¶ 19.) During his deposition, Plaintiff was shown a photo of the crane with the boom positioned at a fifty degree angle and was asked if that angle accorded with the position of the crane at the time of the accident. (Pl.'s Dep. 36.) Plaintiff responded that it did. (*Id.*) Plaintiff, however, argues that he was merely stating that the "approximate position" of the crane was as shown in the photograph, and that the boom could have been lower to the ground when the accident occurred. (Pl.'s Mem. 2 n.2; Ramos Decl. 2.) The photos themselves were taken after Serio positioned the boom at an angle that he believed approximated the angle of the boom during the accident. (Serio Dep. 42-43.) Serio also testified, however, that he believed the hole in the boom was approximately seven to eight feet above the flatbed of truck, not the nine feet that would have resulted if the boom had been at the approximate angle in the pictures. (Serio Dep. 78.)

B. Expert Opinions

1. Joseph Champagne, P.E.

Plaintiff submits the report of Joseph S. Champagne ("Champagne") in support of his opposition to Defendant's Motion to Dismiss. Champagne is a registered professional engineer, although his speciality is in transportation planning. (Def.'s Ex. J (Champagne Resume) at 2.)

Champagne's firm conducted an inspection and analysis of the following objects and documents: Serio's crane; a Model TC-110 Owner's Manual, dated September 1988; various photographs of the crane, most of which were taken by employees of Champagne; and a

description of the accident provided by Plaintiff's counsel. (Def.'s Ex. J (Champagne Report) at 1-2 ("Champagne Rep.").) Voley Martin, an associate at Champagne's engineering firm, did the inspection of the crane and most of the analysis. (Champagne Dep. 12, 22-23.) Although Martin has considerable experience in vehicle operations, he is not a licensed engineer, and Champagne did not know if Martin had any prior experience with cranes. (*Id*. 23.) It was Martin, not Champagne, who reviewed the owner's manual that came with the crane. (*Id*. 67.) In addition, Champagne did not review the sworn testimony of Plaintiff nor the witnesses in formulating his conclusion – which, Plaintiff acknowledged, was the regular methodology in cases of this sort. (*Id*. 37-38, 121-22, 126.)

Champagne did not review standards promulgated by Occupational Safety and Health Administration (OSHA), the American Society of Mechanical Engineers (ASME), or the American National Standards Institute (ANSI) relating to the construction of cranes. (*Id*. 25-27.) Champagne did look for OSHA and ANSI regulations dealing with pinch-points, but did not find any regulations relevant to his inquiry. (*Id*. 25.) Champagne never spoke to anyone in the crane manufacturing business regarding the proper construction of cranes or the guarding/labeling of pinch points and inspection ports. (*Id*. 99-100.)

From a review of the documents, photographs, and Martin's inspection of the crane, Champagne found two principal design defects: Defendant's failure to include guards on the inspection ports and Defendant's failure to place warning labels on the inspection ports. (Champagne Rep. 4.) Champagne further reported that the failure to install guards and/or warn

of the danger of the inspection ports was the proximate cause of Plaintiff's injury. (*Id.* 5-6).[6]

Champagne's findings will be discussed in turn.

First, Champagne opined that the accident would have been avoided had Defendant installed inexpensive guard covers over the inspection ports. (*Id.* 5.) His report, however, does not give any detail as to how inexpensive such covers would be, or how they might be applied. In his deposition, Champagne clarified that the guards could have been metal or plastic, and could have been screwed to the outside of the boom. (Champagne Dep. 60-63.) Champagne opined that the holes that Defendant would have had to drill into the boom to secure the guards would not have compromised the strength of the boom, although he admitted that he did not know the actual thickness of the boom in question. (*Id.* 64-65.) Champagne did not attempt to design such a guard. (*Id.* 62, 90.) In addition, Champagne could not identify with any specificity any other crane that used similar guards: he stated that he had seen one once, somewhere between 1969 and 1973, but did not know what kind of crane it was, or if the inspection ports were in any way similar to the crane in this case. (*Id.* 63.)

Second, Champagne opined that the crane needed warning labels next to the inspection ports. (Champagne Rep. 5; Champagne Dep. 56-57.) He noted that the crane had various other warning labels, none of which indicated the danger of the inspection ports. (Champagne Dep. 54.) Champagne also presented an example of a pinch point warning label that "can be found on truck machinery throughout the industry." (Champagne Rep. 5.) Champagne was unable,

---

[6]Throughout his report, Champagne states that the alleged design failures of Defendant were the "proximate cause" of the accident. (Champagne Dep. 29.) In his deposition, Champagne stated that he was "somewhat" familiar with the legal concept of proximate cause, but later clarified that by proximate cause, he really just meant "cause." (*Id.* 29.)

however, to give more than the most basic information about this warning label. Although Champagne knew that the label came from a utility crane in Florida, he could not identify the manufacturer or model number, where the label was affixed on the crane, and whether the label had anything to do with inspection ports similar to those on the crane designed by Defendant. (*Id*. 84-85.) Although Champagne did not identify any written industry standards regarding the construction of cranes or the operation of pinch points, Champagne stated that the "accepted industry practice" was to provide warning labels for such inspection ports. (*Id*. 94.)

Finally, Champagne opined that Defendant failed to conduct an adequate study of the safe operation of the crane. Champagne admitted in his deposition, however, that he did not know if Defendant had or had not conducted a study, but rather that he assumed – based on his low opinion of the crane's design – that Defendant had not. (*Id*. 50-52.) Champagne clarified that he had no personal knowledge of the design process undergone by Defendant. (*Id*. 53.)

### 2. Charles Mark Ricard

Defendant submits the report of Charles Ricard ("Ricard"), president of Equipment Safety Consultants, in support of its Motion for Summary Judgment. Mr. Ricard is a mechanical engineer with more than thirty years experience in the material handling industry, which includes the design, maintenance, use, and operation of truck-mounted mobile hydraulic cranes. (Def.'s Ex. L. (Ricard Report) at 1 ("Ricard Rep.").)

Ricard conducted an inspection and analysis of the following objects and documents: Plaintiff's responses to Defendant's interrogatories; Plaintiff's deposition; photocopies of the photos presented to Plaintiff during his deposition; a copy of Champagne's report; a copy of the TC-110 Owner's Manual; photos and video of the crane taken during a January 12, 2007

inspection; a DVD of the January 12, 2007 inspection; a memo of the January 12, 2007 inspection; and Serio's Deposition and relevant exhibits. (*Id*. 1.) Ricard also reviewed OSHA, ASME, and ANSI standards relevant to crane construction and safety precautions. (*Id.*)

In sum and substance, Ricard stated that the crane – along with its operating manual, placards, and warning decals – meets the design requirements expressed in industry standards and relevant government regulations for truck-mounted hydraulic cranes. (*Id.* 2.) According to Ricard, the inspection ports on the boom did not present a hazard to a foreseeable user because the ports were "safeguard[ed] by location/distance" – that is, they were located in an area such that they would not be accessible during normal operation of the unit. (*Id.* 3) Richard further opined that the accident occurred because Plaintiff recklessly climbed onto the mesh bulkhead between the crane and the cab while the crane was in operation, even though he understood the risks of his conduct.[7] Such conduct, according to Ricard, is sufficiently abnormal so as not to be foreseeable by Defendant. (*Id.*)

Ricard also analyzed Champagne's report, and found it wanting in several respects. In particular, Ricard takes issue with Champagne's failure to present any detail about his proposed guards and proposed warning signs. (*Id.*)

### 3. Norman Creighton Hargreaves

Norman Creighton Hargreaves ("Hargreaves") testified on behalf of Defendant in his capacity as director of product safety for Defendant. (Hargreaves Dep. 7, 10.)[8] He has been

---

[7]As noted earlier, Serio believes that Plaintiff climbed onto the mesh bulkhead, but the Parties appear to agree that Plaintiff was standing on an adjacent log when the accident occurred.

[8]Hargreaves also prepared a report of the accident (Hargreaves Dep. 14), but this report was not presented as an exhibit by either Party.

involved in the design of cranes for several decades, both with Defendant and with other companies. (*Id.* 4-8.) He is part of a company's "B-30 Committee," which receives input from crane users, crane inspectors, and crane trainers to make sure appropriate standards are used by Defendant in the construction of its cranes. (*Id.* 132.)

According to Hargreaves, the cause of the accident was Plaintiff's decision to climb atop the log or mesh bulkhead on the flatbed truck. Hargreaves was shocked to learn that Serio was operating the crane with Ramos standing elevated next to the boom. (*Id.* 102.) Hargreaves testified that it is foreseeable that workers might stand on the flatbed of the truck, in order to hook or unhook a load (*id.* 115), but that it was not foreseeable that Plaintiff would act as he did. Cranes, he said, are not designed with the anticipation that people will stand on logs or bulkheads, and called such behavior "absolutely beyond belief." (*Id.* 102-03, 112.)

In regard to the issue of guards, Hargreaves testified that OSHA standards do not require guards on inspection ports. (*Id.* 99-100.) He noted, however, that Defendant has replaced the TC-110 with a new model, and that the new model does feature guards on the inspection ports. (*Id.* 74.) These guards are fastened onto the boom with two number two screws – the operator loosens the screws and slides the guard to gain access to the inspection port. (*Id.* 86.) According to Hargreaves, the guards were added because Defendant changed the placement of the operator: the new crane features a "rider seat," which means the operator sits in a chair right next to the base of the boom. (*Id.* 75.) As a result of the new design, the operator could reach up and touch the access holes while properly operating the crane, thus necessitating the guards. (*Id.* 75.)

In regard to the issue of warning decals, Hargreaves testified that in his many years of

experience, he had never seen a warning decal next to an inspection port. (*Id*. 67-68, 80.) It never occurred to him to place a warning on the inspection ports, because, in his opinion, the inspection ports were not located in an area where people could access the boom while it was operational. (*Id.* 68-71, 83-84.)

Hargreaves confirmed the finding of Champagne that the operating manual of the TC-110 says nothing about the danger of putting one's hand in the inspection ports while the crane is running. (*Id.* 118-19.) He also questioned Champagne's knowledge of cranes, in part because Champagne is not a mechanical engineer. (*Id.* 133.)

Finally, Hargreaves revealed that he had previously testified in two similar cases – he identified them as the "City of Redlands" and "Holston" cases – in which the plaintiff lost fingers while reaching into an inspection port of a boom of a crane designed and manufactured by Defendant. (*Id.* 71.) In the first of these cases, "City of Redlands," the plaintiff attached a large tool box to the bed of the truck, which enabled workers to lift themselves closer to the elevated inspection port on the boom, resulting in the accident. (*Id.* 106-07.) In that case, Hargreaves testified that the misuse by the plaintiffs was not foreseeable. (*Id.* 106.) In total, Hargreaves was aware of six cases in which individuals were harmed by placing hands in inspection ports, but was not aware of the specific details of those accidents. (*Id.* 144.)

## II.  Discussion

### A.  Defendant's Motion to Strike Plaintiff's Rule 56.1 Statement

Defendant argues that the Court should strike Plaintiff's Statement of Facts, as it violates Local Civil Rule 56.1(c). Local Civil Rule 56.1 requires a movant to accompany "any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure [with a] short

and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a) (emphasis omitted). The party opposing summary judgment must respond to the movant's statement of facts with its own statement of facts, which must include "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party." *Id*. 56.1(b) (emphasis omitted). Significantly, the rule provides that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." *Id*. 56.1(c) (emphasis omitted).

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Pursuant to Local Civil Rule 56.1(c), a district court may deem one party's statement of facts admitted should the opposing party fail to specifically contest the individual paragraphs. *See Gubitosi v. Kapica,* 154 F.3d 30, 31 n.1 (2d Cir. 1998); *see also Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000) (affirming district court's grant of summary judgment following plaintiff's failure to deny, in accordance with Local Rule 56.1, various pivotal statements of fact); *Knight v. New York City Hous. Auth.*, No. 03-CV-2746, 2007 WL 313435, at *1 n.1 (S.D.N.Y. Feb. 2, 2007) (deeming defendant's statement admitted where plaintiff offered non-responsive statements or responsive statements unsupported by the record). However, a district court also has broad discretion to decide whether to overlook a party's failure to comply with

this provision, and instead "opt to conduct an assiduous review of the record" to make up for a party's failure to file a proper 56.1 Statement. *See Holtz*, 258 F.3d at 73 (internal quotation marks omitted).

Here, the Court's review of the record has been made substantially more difficult by Plaintiff's failure to comply with Local Rule 56.1. Rather than respond to the numbered assertions of fact set forth in Defendant's statement, Plaintiff "elected to set forth a series of independent and . . . non-responsive assertions." *BMS Entm't/Heat Music LLC v. Bridges*, No. 04-CV-2584, 2005 WL 1593013, at *4 n.4 (S.D.N.Y. July 7, 2005). Although the Court would be justified in striking Plaintiff's statement for failure to adhere to the rules of this district, the Court will, in its discretion, admit the statement and conduct an independent review the record. *See Shah v. Consol. Edison Corp. of New York*, No. 04-CV-2880, 2005 WL 612713, at *2 (S.D.N.Y. Mar. 15, 2005) (deciding to conduct a search of the record, despite the fact that plaintiff's Rule 56.1 statement "effectively ignored many of defendant's assertions by offering in response either non-responsive citations to the record or wholesale references to entire depositions without any particularization of the paragraphs he regarded as responsive.").[9] Accordingly, Defendant's Motion to Strike Plaintiff's 56.1 Statement is denied.

---

[9]Even if the Court did treat Defendant's 56.1 Statement as admitted by Plaintiff, the Court would still have to thoroughly review the record, as Defendant is not entitled to judgment as a matter of law unless the individually numbered paragraphs in its 56.1 Statement are supported by admissible evidence. *See* Local Civil Rule 56.1(d); *see also BMS Entm't*, 2005 WL 1593013, at *4 n.4 (citing *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." (internal quotation marks omitted))).

B.  Defendant's Summary Judgment Motion

1.  Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor.  *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006).  Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact."  *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir. 2006).  "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."  *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").  The materiality of the facts is governed by substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, the court is not charged with weighing the evidence and determining its truth, but only with determining whether there is a genuine issue for trial.  *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990); *see also Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006).  The Court's goal should be to "isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp.*, 477 U.S. at 323-24.

## 2.   The Law of Defective Product Design and Failure to Warn

"'Manufacturers of defective products may be held strictly liable for injury caused by their products – meaning that they may be liable regardless of privity, foreseeability or reasonable care.'" *Church Ins. Co. v. Trippe Mfg. Co.*, No. 04-CV-6111, 2005 WL 2649332, at *1 (S.D.N.Y. Oct. 17, 2005) (quoting *Sprung v. MTR Ravensburg, Inc.*, 788 N.E.2d 620, 622 (N.Y. 2003)).  "In New York, there are three distinct claims for strict products liability:  (1) a manufacturing defect, which results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm; (2) a warning defect, which occurs when the inadequacy or failure to warn of a reasonably foreseeable risk accompanying a product causes harm; and (3) a design defect, which results when the product as designed is unreasonably dangerous for its intended use." *McCarthy v. Olin Corp.*, 119 F.3d 148, 155-56 (2d Cir. 1997) (internal citations omitted); *see also Church Ins.*, 2005 WL 2649332, at *1.  Here, Plaintiff has alleged claims for defective design and failure to warn, but not defective manufacture.[10] Accordingly, the Court will address Plaintiff's two claims in turn.

---

[10]The Third Cause of Action in Plaintiff's Complaint alleges that Defendant was "negligen[t] . . . for failing to use proper skill in manufacturing . . . said product."  (Compl. ¶ 32.) However, Plaintiff conceded at the September 5, 2008 oral argument that he has not presented any evidence that could lead a reasonable trier of fact to believe that Defendant's crane was manufactured in a negligent manner.  (Champagne Def. 77-78 (noting that there is no evidence that the crane malfunctioned).)  Accordingly, to the extent that Plaintiff alleges that the crane suffered from a manufacturing defect, Defendant's Motion for Summary Judgment is granted.

<u>a. Design Defect and Negligent Design</u>

<u>i. Applicable Legal Principles</u>[11]

"In a claim for defective design, plaintiff must make a showing that (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury." *Colon ex rel. Molina v. BIC USA, Inc*., 199 F. Supp. 2d 53, 83 (S.D.N.Y. 2001); *see also G.E. Capital Corp. v. A.O. Smith Corp*., No. 01-CV-1849, 2003 WL 21498901, at *4 (S.D.N.Y. July 1, 2003) (same); *Anaya v. Town Sports Int'l, Inc.*, 843 N.Y.S.2d 599, 601 (App. Div. 2007) ("To establish a prima facie case for strict products liability based on defective design, the plaintiff must show that 'the product was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury.'" (quoting *Voss v. Black & Decker Mfg. Co.*, 450 N.E.2d 204, 208 (N.Y. 1983))).

The first two prongs of the prima facie case – whether the product posed a substantial likelihood of harm and could have been designed in a safer manner at the time of manufacture – are often referred to as the "risk/utility balancing test," as the two considerations work together to determine whether the product was "unreasonably dangerous." *Colon*, 199 F. Supp. 2d at 84; *see also Anaya*, 843 N.Y.S.2d at 601 ("[T]he proper inquiry is 'whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner.'" (quoting *Voss*, 450 N.E.2d at 208)). Thus, in addition to showing that the

---

[11]As acknowledged by both Parties, this Court applies the substantive law of New York in this diversity action. (Mem. of Law in Supp. of the Def.'s Mot. for Summ. J. ("Def.'s Mem.") 8; Pl.'s Mem. 9-10.)

product posed a "substantial likelihood of harm," *Voss*, 450 N.E.2d at 208, a plaintiff must prove the existence of an alternative design by demonstrating that such an alternative "is feasible, practical, economical, and safe," or by identifying "manufacturers of similar equipment that have put the proposed design into use."[12]  *See Galletta v. Valmet*, Inc., No. 04-CV-313, 2007 WL 963288, at *4 (N.D.N.Y. Mar. 30, 2007).  Finally, if the product fails the risk/utility analysis, the plaintiff must then "show that the defective design was a substantial cause of the injury." *Colon*, 199 F. Supp. 2d at 84.

As noted by the New York Court of Appeals, the use of risk/utility analysis in measuring defectiveness has brought the design-defect inquiry closer to the standard used in negligence cases.  *Denny*, 662 N.E.2d at 735.  Thus, "[w]hile efforts have been made to steer away from the fault-oriented negligence principles by characterizing the design defect cause of action in terms of a product-based rather than a conduct-based analysis, the reality is that the risk/utility

---

[12]In balancing the product's utility against its risks, a court assesses the following factors:

> (1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury, (4) the availability of a safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the cost of any safety-related design changes.

*Fitzpatrick v. Currie*, 861 N.Y.S.2d 431, 433 (App. Div. 2008) (quoting *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 735 (N.Y. 1995)); *see also Anaya*, 843 N.Y.S.2d at 601.  This analysis is "rooted in a recognition that there are both risks and benefits associated with many products and that there are instances in which a product's inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits."  *Denny*, 662 N.E.2d at 735 (citing Prosser and Keeton, Torts § 99, at 699 (5th Ed.)).  "[Such] weighing of the product's benefits against its risks is an appropriate and necessary component of the liability assessment under the policy-based principles associated with tort law."  *Id*.

balancing test is a 'negligence-inspired' approach, since it invites the parties to adduce proof about the manufacturer's choices and ultimately requires the fact finder to make a judgment about [the manufacturer's] judgment." *Id.* (internal citations omitted). Because in the analysis of the defectiveness of a given design "an assessment of the manufacturer's conduct is virtually inevitable," *id.*, the Court's analysis of Plaintiff's design defect claim will also serve as the analysis of Plaintiff's negligent design claim, *see Colon*, 199 F. Supp. 2d. at 83 ("Courts have noted that, for the purposes of analyzing a design defect claim, the theories of strict liability and negligence are virtually identical."); *G.E. Capital Corp.*, 2003 WL 21498901, at *4 ("[P]laintiff must make out the same prima facie case regardless of whether the claim is based in strict liability or negligence."); *Searle v. Suburban Propane Div. of Quantum Chem. Corp.*, 700 N.Y.S.2d 588, 591 (App. Div. 2000) ("[I]n a design defect case, there is almost no difference between a prima facie case in negligence and one in strict liability."); *see also Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 79-80 (2d Cir. 2006) (analyzing negligent design case by applying above standard).

### ii.  Analysis

To satisfy the "risk-utility" portion of Plaintiff's prima facie case, Plaintiff must show that the product was unreasonably dangerous – that is, that the product as designed posed a substantial likelihood of harm and it was feasible to design the product in a safer manner. *See Colon*, 199 F. Supp. 2d at 84. The second element of this test is easily demonstrated – there is evidence in the record, in the form of testimony by an employee of Defendant, that it was indeed feasible and cost-efficient to design the crane in a safer manner. Norman Hargreaves, the director of product safety for Defendant, testified that the crane model that replaced the TC-110

18

features guards over the inspection ports, which are attached to the boom with two small screws. (Hargreaves Dep. 74, 86.) "Evidence of a manufacturer's postmanufacture modification is admissible in a design defect case if the manufacturer contests the feasibility of that design modification." *See Doty v. Navistar Int'l Transp. Corp.*, 639 N.Y.S.2d 592, 596 (App. Div. 1996) (citing *Haran v. Union Carbide Corp.*, 497 N.E.2d 678, 678-79 (N.Y. 1986)). Accordingly, Plaintiff has shown that it was feasible to design the crane in a safer manner.[13]

Feasibility of design, however, must be counterbalanced by the consideration of whether the product, as designed, posed a substantial likelihood of harm. Here, Plaintiff presents the testimony of a purported expert, Joseph Champagne, in support of his claim that the crane was designed in a defective manner. Champagne opines that Defendant's failure to attach covers to the inspection ports exposed Plaintiff to risk of foreseeable personal injury. Defendant, however, challenges the basis of Champagne's testimony. In particular, Defendant argues that Champagne's failure to reference relevant safety standards in his analysis of the design of the crane renders his analysis insufficient to raise a triable fact.

"Ordinarily, the opinion of a qualified expert that a plaintiff's injuries were caused by a deviation from relevant industry standards would preclude a grant of summary judgment in favor of the defendants." *Murphy v. Conner*, 646 N.E.2d 796, 798 (N.Y. 1994). Although, as noted by Defendant, Champagne's report does not refer to any applicable industry standards, Defendant overstates the relevance of industry safety standards. In determining whether a design defect exists, "it is helpful to examine the industry safety standards applicable to the design" of the

---

[13]At the September 5, 2008 oral argument, Defendant stated that it is not contesting the feasibility of applying guards to the crane in question. Defendant also acknowledged that the expense of installing such guards would be minimal, falling somewhere in the ten to twenty-five dollar range.

device in question.  *See Church Ins.*, 2005 WL 264332, at *1 (internal quotation marks omitted).

However, while industry standards "may provide relevant evidence" in assessing the existence of

a design defect, industry standards are "not dispositive."  *Id.*; *see also Del Cid v. Beloit Corp.*,

901 F. Supp. 539, 546 (E.D.N.Y. 1995) ("Compliance or lack of compliance with industry safety

standards, however, is not dispositive of the issue of a design defect, and other evidence

concerning the design and safety of the machine may be considered." (internal citations

omitted)).[14]  Accordingly, a design may be held defective even when in compliance with relevant

---

[14]Defendant cites a number of cases for the proposition that Plaintiff must show a violation of applicable industry standards to make a prima facie case of defective design.  (Def.'s Mem. 11-12.)  These cases, however, only demonstrate that the failure to cite industry standards is a factor (among several) that New York courts have employed to show that the non-movant has failed to raise a question of fact – the cases do not state that the demonstration of a violation of industry standards is a threshold issue.  *See, e.g., Bova v. Caterpillar, Inc.*, 761 N.Y.S.2d 85, 87 (App. Div. 2003) (finding engineer's testimony insufficient to raise a triable issue of fact because the engineer "failed to indicate that his opinion was based on inspection of the forklift, the workplace where the accident occurred, or the failure to abide by industry standards or government regulations"); *Martinez v. Roberts Consol. Indus., Inc.,* 749 N.Y.S.2d 279, 280 (App. Div. 2002) (finding engineer's testimony regarding design of a knife insufficient to raise an issue of material fact because the engineer's opinion "was not supported by any foundational facts such as actual testing of the knife, a deviation from industry standards, statistics showing frequency of injury resulting from the design of the knife, or consumer complaints."); *Cervone v. Tuzzolo*, 738 N.Y.S.2d 60, 62 (App. Div. 2002) ("The testimony of the plaintiff's expert, who had no practical experience or personal knowledge in the design of dining room furniture, was unsupported by foundational facts *such as* a deviation from industry standards or statistics showing the frequency of injuries caused by such a design." (emphasis added))*; Martinez v. Roberts Consol. Indus., Inc.,* 749 N.Y.S.2d 279, 280 (App. Div. 2002) (finding engineer's testimony regarding design of a knife insufficient to raise an issue of material fact because the engineer's opinion "was not supported by any foundational facts such as actual testing of the knife, a deviation from industry standards, statistics showing frequency of injury resulting from the design of the knife, or consumer complaints."); *Hofmann v. Toys "R" Us – N.Y. Ltd. P'ship*, 707 N.Y.S.2d 641, 641 (App. Div. 2000) (finding engineer's testimony insufficient to raise an issue of material fact due to lack of expert qualifications, but also noting that engineer did not reference relevant industry standards); *Ruggiero v. Waldbaums Supermarkets, Inc.*, 661 N.Y.S.2d 37, 39 (App. Div. 1997) ("In the present case, however, there is no indication that the plaintiffs' engineer had any training or experience in the supermarket industry or that he visited the site of the accident, nor did he relate a violation of any industry standard.  Under these circumstances, his unsupported and conclusory statements regarding the height of the

ANSI standards. *See Wald v. Costco Wholesale Corp.,* No. 03-CV-6308, 2005 WL 425864, at

*7 n.8 (S.D.N.Y. Feb. 22, 2005) (noting that lack of compliance with ANSI standards is "not

dispositive of the issue of a design defect."); *Clarke v. LR Sys.,* 219 F. Supp. 2d 323, 334-35

(E.D.N.Y. 2002) (holding that expert's opinion was not unreliable simply because product in

question was in compliance with ANSI industry standards).

Although Champagne's failure to reference relevant industry standards does not render

his opinion unreliable, the Court is troubled by the rather conclusory nature of his report. *See

Murphy*, 646 N.E.2d at 798 (noting that an expert opinion that is conclusory will be insufficient

to create a triable issue of fact). Champagne states that the inspection port covers should have

been included in the design of the crane, but does not provide support for his conclusion. And

his direct testimony did not fill in the needed detail: to the contrary, Champagne indicated in this

deposition that he could not identify with any specificity any other cranes that used similar

guards. (Champagne Dep. 63.) Rather, Champagne testified that he had seen a crane with such

guards sometime between 1969 and 1973, but did not know what kind of crane it was, or if the

inspection ports were in any way similar to those in the present case. (*Id.*) In light of such

testimony, it is difficult to assess the basis on which Champagne rendered such "expert"

conclusions.

Assuming without deciding that Champagne's expert testimony should be discounted,

Plaintiff still has presented enough admissible evidence to raise a question of fact as to whether

the lack of guards on the inspection ports entailed a substantial risk of harm. The evidence

before the Court adequately demonstrates the threat presented to anyone who might place a hand

---

supermarket shelves and the store's stacking practices were insufficient to raise a genuine issue
of material fact.").

inside an inspection port while the crane was running. Defendant's expert, Charles Ricard, testified that covers for the inspection ports were unnecessary because they were "safeguard[ed] by location/distance," and thus were of no hazard to a foreseeable user. (Ricard Rep. 3.) Hargreaves testified, however, that it was foreseeable that workers might stand on the flatbed upon which the crane was mounted, for example, to hook or unhook a load. (Hargreaves Dep. 115.) And in such situations – where workers stand upon the flatbed near the base of the crane – Hargreaves opined that "there's a possibility of somebody being pinched on the bed of the truck." (*Id.* 110.) Furthermore, this possibility of injury would be accentuated if, at the time of the accident, the inspection port was not nine feet above the flatbed of the truck, as argued by Defendant (Def.'s 56.1 Stmt. ¶ 19), but closer to the seven to eight feet suggested by Serio in his deposition (Serio Dep. 78).[15] This evidence, counterbalanced by the (apparently) minimal costs of covering the inspection ports, is sufficient to raise a question of fact as to whether the crane was unreasonably dangerous at the time it was designed.[16] Accordingly, Plaintiff has satisfied the risk-utility portion of his prima facie case.

Finally, Plaintiff must show "that the defective design was a substantial cause of the

---

[15]During the September 5, 2008 oral argument, Defendant's counsel agreed that the inspection ports would not be "safeguarded by location/distance" if they were only seven feet above the flatbed of the truck.

[16]Plaintiff also presents evidence of several other accidents involving inspection ports on cranes manufactured by Defendant. Such accidents may be introduced as evidence of a dangerous condition and/or notice of a dangerous condition if Plaintiff demonstrates that "the conditions prevailing at the time of the earlier accidents were substantially the same as existed at the time of the subject accident." *Kane v. Triborough Bridge & Tunnel Auth.*, 778 N.Y.S.2d 52, 54 (App. Div. 2004). Because the Court denies Defendant's Motion without appeal to these prior accidents, the Court does not have to rule on the admissibility of this evidence as part of this Opinion and Order.

injury." *Colon*, 199 F. Supp. 2d at 86. Although Champagne states that the crane's design flaw was a substantial cause of the accident, this testimony is open to question. As noted in his deposition, Champagne's entire understanding of the facts of the accident came from a description provided to him by Plaintiff's counsel (Champagne Rep. at 2) – he did not review the testimony of Plaintiff or any of the witnesses in formulating his conclusion (Champagne Dep. 37-38, 121-22, 126). Although Champagne did not have a firm basis for determining whether the alleged defect was a substantial cause of this accident, expert testimony is not required if a reasonable jury could have found substantial cause from consideration of the other evidence in the case. *See Voss*, 450 N.E.2d at 209 ("Expert testimony with reference to proximate causation is not always required; in this case the jury could have found proximate causation from its consideration of the characteristics of [the allegedly defective product] and plaintiff's description of how the accident happened."); *see also Lumbermens Mut. Cas. Co. v. Banco Espanol de Credito*, S.A., No. 03-CV-5819, 2006 WL 2987694, at *6 (S.D.N.Y. Oct. 13, 2006) ("'It is well settled that expert testimony is unnecessary in cases where jurors 'are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'" (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004))); *Faryniarz v. Nike, Inc.*, No. 00-CV-2623, 2002 WL 530997, at *2 (S.D.N.Y. April 8, 2002) (noting that while expert testimony may be necessary to establish causation in cases relating toxic torts or medical malpractice, in other less-technical cases a non-expert witness can provide evidence of causation.). Here, the reasonable inference from the testimony of Plaintiff is that if the inspection ports had been covered, Plaintiff's hand would not have been injured when he reached up to grasp the boom for stability. (Pl.'s Dep. 41-42.) Accordingly,

Plaintiff has satisfied his burden of demonstrating that the alleged design defect was a substantial

cause of his injury, and as a result, Defendant's Motion to Dismiss Plaintiff's claims of design

defect and negligent design is denied.

### b.  Failure to Warn

#### i.  Applicable Legal Principles

"A failure to warn claimant must show (1) that a manufacturer has a duty to warn; (2)

against dangers resulting from foreseeable uses about which it knew or should have known; and

(3) that failure to do so was the proximate cause of harm."  *Colon*, 199 F. Supp. 2d at 84; *see*

*also Burke v. Spartanics*, *Ltd*., 252 F.3d 131, 137-40 (2d Cir. 2001) (same).  As with design

defect claims, "[f]ailure to warn claims are identical under strict liability and negligence theories

of recovery."  *Colon*, 199 F. Supp. 2d at 85; *see also Enright v. Eli Lilly & Co.*, 570 N.E.2d 198,

203 (N.Y. 1991) (noting that a failure to warn claim "couched in terms of strict liability, is

indistinguishable from a negligence claim.").

Whether a manufacturer has a duty to warn is typically a question for the jury.  *See*

*Colon*, 199 F. Supp. 2d at 85; *see also Liriano v. Hobart Corp*., 132 F.3d 124, 131 (2d Cir. 1998)

(hereinafter *Liriano I*) (noting that in failure to warn cases premised upon a product that had

been modified by a third party, courts "squarely hold that it is up to the jury to decide whether

the manufacturer, in fact, has a duty to warn . . . .").  However, there are "a limited class of

hazards [that] need not be warned of as a matter of law because they are patently dangerous or

pose open and obvious risks."  *Liriano v. Hobart Corp*, 700 N.E.2d 303, 308 (N.Y. 1998)

(hereinafter *Liriano II*); *see Burke*, 252 F.3d at 137 (same).  Therefore, "[w]here a danger is

readily apparent as a matter of common sense, there should be no liability for failing to warn

someone of a risk or hazard which he [or she] appreciated to the same extent as a warning would have provided. Put differently, when a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning." *Liriano II,* 700 N.E.2d at 308 (internal quotation marks omitted and alteration in original).

The open and obvious risk exception is measured based on all foreseeable users – the duty to warn exists as long as the relevant risks are not obvious to some members of the class of foreseeable users. *See Burke*, 252 F.3d at 138. Thus, whether a given risk is obvious depends on what the "mass of users knows and understands" about the use of the product, not what any particular plaintiff understands about the risks. *Id.* Accordingly, the manufacturer's duty does not change if a particular plaintiff understood the gravity of the risk in a way that the average foreseeable user did not. *Id.* (noting that it was error for the trial court to instruct the jury "that there is no duty to warn simply because *the particular plaintiff* was cognizant of the relevant hazards" (emphasis in original)).

While a plaintiff's specific knowledge of a risk does not change a manufacturer's duty to warn, that knowledge still may affect the manufacturer's liability. The third prong of a plaintiff's failure to warn claim requires the plaintiff to show that the defendant's failure to provide a warning was the proximate cause of his or her injuries. Although under New York law there is "a presumption that a user would have heeded warnings if they had been provided, and that the injury would not have occurred," *Anderson v. Hedstrom Corp*., 76 F. Supp. 2d 422, 441 (S.D.N.Y. 1999), a defendant may rebut this presumption by introducing "'specific facts showing that the warning would have been futile.'" *G.E. Capital Corp*., 2003 WL 21498901, at

*5 (quoting *Colon*, 199 F. Supp. 2d at 85).  Futility of a warning may be demonstrated by showing that "the risk was well understood by the plaintiff," and therefore "a warning would have made no difference."  *Burke*, 252 F.3d at 139.  In such situations, "where the injured party was fully aware of the hazard through general knowledge, observation or common sense," the defendant's failure to warn will not be the legal cause of the plaintiff's injury.  *Id.* (internal citation marks omitted); *see also Gonzalez v. Morflo Indus., Inc*., 931 F. Supp. 159, 168 (E.D.N.Y. 1996) ("[W]here a warning would not have increased the particular injured user's awareness of the danger, failing to warn cannot be said to have been the proximate cause of the accident.").

## ii.  Analysis

The Court need not decide whether Defendant had a duty to warn, as Plaintiff has failed to establish that the alleged failure to warn was the proximate cause of his injuries.  To establish proximate cause in a failure to warn claim, Plaintiff must "adduce proof that had a warning been provided, [he] would have read the warning and heeded it."  *Mulhall v. Hannafin*, 841 N.Y.S.2d 282, 287 (App. Div. 2007).  Here, the evidence before the Court shows that Plaintiff well-understood that the inspection ports open and close when the boom of the crane extends or retracts.  (Pl.'s Dep. 38.)  Specifically, Plaintiff understood the danger of working near the boom of the crane, and stated that he never would have climbed up on the tree trunk or bulkhead if he knew the crane was about to move.  (*Id*. 59.)  And finally, Plaintiff testified that when he grabbed the boom and inserted his fingers into the inspection port, he did not look to see where he was placing his hand (*id*. 41-42) – and thus would not have seen any warning that might have

been present.[17]  In sum, Plaintiff has not presented any evidence showing that he lacked an understanding of the dangers inherent in the inspection port, or that he would have heeded a warning label had one been present.[18]  Accordingly, because any warning to this specific Plaintiff would have been futile, Defendant's Motion for Summary Judgment on Plaintiff's failure to warn claim is granted.  *See Burke*, 252 F.3d at 139 (noting that a failure to warn will not be the cause of the harm if "the risk was well understood by the plaintiff" and thus "would have made no difference.").

---

[17]Plaintiff's counsel conceded this point at the September 5, 2008 oral argument:  even if there had been a warning label on the boom, Plaintiff's counsel stated Plaintiff would not have seen it in the moments before he placed his fingers inside the inspection port.

[18]Plaintiff argues that although he understood the danger of working near the boom of the crane, he "momentarily forgot" about the danger of the boom in the moments before the accident.  (Pl.'s Mem. 19.)  Plaintiff, however, has not directed the Court's attention to *any* case that holds that a plaintiff's momentary inattentiveness to a previously-understood danger can excuse the proximate cause requirement of a failure to warn claim.

## III. Conclusion

For the reasons discussed above, Defendant's Motion for Summary Judgment on

Plaintiff's manufacturing defect and failure to warn claims is granted, but Defendant's Motion

for Summary Judgment on Plaintiff's defective design and negligent design claims is denied.

The Clerk of Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 21, 23,

24.)


SO ORDERED.

Dated:      September /<i>O</i>, 2008
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

28

Service List by ECF:

Howard B. Stolzenberg, Esq.
Lever & Stolzenberg
303 Old Tarrytown Road, Suite 216
White Plains, NY 10603
(914) 288-9191
*Counsel for Plaintiff*

Terrence J. Cortelli, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, NY 10017
(914) 761-2252
Fax: (914) 323-7001
Email: terrence22@hotmail.com
*Counsel for Defendant*

Joseph A. D'Avanzo, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
177 Broad Street, 6th Floor
Stamford, CT 06901
(914) 323-7000
Fax: (914) 323-7001
Email: davanzoj@wemed.com
*Counsel for Defendant*

Charles C. De Martino, Esq.
Wilson, Elser, Moskowitz Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10604
(914) 323-7000
Fax: (914) 323-7001
Email: charles.demartino@wilsonelser.com
*Counsel for Defendant*